15. Cersosimo was the next-lowest bidder in the COG sand bids.

16. At some point in the fall of 2000, Kingsley approached the Board of Selectmen (which at that time consisted of Janice Leh, Richard Steward, and William H. Shores) about the sand contract.

17. After discussion in the fall of 2000, the Board of Selectmen agreed that Bernardston should purchase sand from Cersosimo rather than from Mitchell. Cersosimo's sand cost only a nickel per ton more than Mitchell's sand, resulting in a total price increase of only $125.00 for the entire season. Due to the consensus that Cersosimo's sand was of a much higher quality than Mitchell's sand, and in light of the minimal price difference, the Selectmen and Kingsley concurred that it was in the best interests of the Town of Bernardston to purchase sand from Cersosimo.

18. In March 2001, Mitchell filed a bid protest with the Massachusetts Inspector General's Office.

19. On March 23, 2001, Heidi Zimmerman, Deputy General Counsel with the Inspector General's Office, sent a letter to Judith A. Beckwith, Treasurer of the Town of Bernardston. The letter directed Ms. Beckwith to stop payments on the Cersosimo sand contract until the Inspector General's Office completed its investigation into the bid protest. See Exhibit A.

20. On March 26, 2001, after reading the March 23, 2001 letter from Ms. Zimmerman, then-Selectman William H. Shores ("Shores") had a telephone conversation with Ms. Zimmerman. On the same day, Shores had a telephone conversation with Bernardston's Town Counsel.

21. After speaking with Ms. Zimmerman and Town Counsel, Shores informed Cahill that "we" needed to create documents for the file to show that "we" had gotten alternate quotes for the sand and had acted in good faith regarding the quality of the sand.

22. Specifically, Shores directed Cahill to create two documents: One dated 9/13/00, requesting sealed bids for approximately 2500 tons of winter sand, which would be opened at the Board of Selectmen's Office on 10/11/00; and a second dated 10/12/00, a letter to the Board of Selectmen from the Highway Superintendent stating that he would like to choose the Cersosimo Industries bid over Mitchell's bid due to the quality of the sand.

23. When Cahill approached then-Selectman Janice Leh ("Leh") and informed her that Shores had directed Cahill to create false documents, Leh instructed Cahill to "lose" the documents or hide them in a computer file.

24.   After investigating, the Inspector General's Office determined that Bernardston's decision to pass over Mitchell was not based on a determination that he was not responsive or responsible, and that Bernardston's procurement of sand from Cersosimo was invalid. See Exhibit B.

25.   In or around August 2001, the Town of Bernardston settled with Mitchell by paying his attorney's fees.

26.   After paying Mitchell's attorney's fees, the Board of Selectmen was satisfied that the matter of the 2000 sand bid was resolved.

27.   In May 2003, the defendant John Patch opened files on Cahill's computer and discovered the two documents that Shores had directed her to create.

28.   It is not part of Patch's job description or job activities to use Cahill's computer for any reason.

29.   Rather than discussing the documents with Cahill, Kingsley, or the Selectmen who were in office at the time of the contract, Patch gave those documents directly to the Inspector General's Office, which reopened its investigation.

30.   On December 9, 2003, Gregory Sullivan, Inspector General, sent a letter to Patch, describing the results of its investigation. See Exhibit C.

31.   On December 12, 2003, Cahill reported to work to discover that an emergency meeting of the Board of Selectmen had been posted.

32.   On that same day, but before the Selectmen met, the locks to Cahill's office were changed. Also on December 12, 2003, Cahill was notified that she was suspended with pay for an unspecified length of time.

33.   Also on December 12, 2003, the lock to the Highway Department Garage was changed, and Kingsley was notified that he was suspended with pay for an unspecified length of time.

34.   On December 16, 2003, during an open meeting of the Board of Selectmen, the defendants read a list of charges against Cahill and Kingsley. See Exhibits D and E.

35.   At that meeting, in the presence of Ms. Cahill's attorney, Edward Berlin, Patch, the Chair of the Board of Selectmen, stated that Cahill had "broken the law" and that the purpose of the upcoming hearing was to determine her punishment.

36.   In the days leading up to the December 16, 2003 meeting, and subsequent to that meeting,

the defendant Selectmen made numerous comments, as indicated in the attached affidavits, demonstrating that they have already decided to terminate Cahill and Kingsley.

37. For example, on December 13, 2003, the defendant Snow commented to Jonathan Pineo, member of the Bernardston Board of Health, that the Board of Selectmen "had something on Theresa Cahill and Merle Kingsley," and implied that both Cahill and Kingsley would loose their jobs because of the allegations made by the Inspector General. See Exhibit F.

38. Cahill and Kingsley have been involved in a relationship for approximately ten years, and currently live together.

39. The Selectmen have demonstrated their inability to impartially judge the facts of this matter against both Kingsley and Cahill for a significant time and have long desired to remove Kingsley and Cahill from their positions. See Exhibits F, G, H, and I (Affidavits of Jonathan Pineo, Richard Steward, William H. Shores, and Janice Leh).

40. For example, the defendant Michael Snow has a brother who is an employee of the Town of Bernardston Highway Department. On several occasions, Mr. Snow has expressed his desire to replace Kingsley by giving the Superintendent job to his brother.

41. The defendant Peter Brulotte has demonstrated a longstanding personal grudge against Kingsley. For example, as long ago as 1993, Brulotte swore that he would "get" Kingsley. Over the past decade, Brulotte has made many additional negative comments about Kingsley. See Exhibits G and H.

42. The defendant John Patch has also demonstrated that he cannot be impartial in the upcoming hearing against Cahill and Kingsley. He has publicly and privately made statements indicating that he expects to terminate Cahill and Kingsley from their positions. See Exhibits F, G, H, I, and J.

43. At Cahill and Kingsley's hearing that is currently scheduled for January 28, 2004, the defendant Selectmen currently plan to function as judges, despite the fact that at least one of them (Patch) will be called as a witness, and despite the numerous indicators of their bias against, and conflicts of interest regarding, Cahill and Kingsley.

44. Since December 12, 2003, the charges against Cahill and Kingsley have garnered a large amount of local media attention, frequently involving front-page headlines in the local newspaper, The Recorder. See Exhibits J and K.

45. Section 6(L)(b) of the Town of Bernardston Personnel Policies and Procedures states that "[a]n employee who is not giving [sic] a probationary period may be discharged for cause." See Exhibit L.

46.  Although the plaintiffs requested on January 7, 2004 that the defendants recuse themselves from sitting as judges at their hearing and appoint an impartial decision-maker, the defendants voted unanimously against doing so, without ever discussing the merits of the plaintiffs' request.

## CAUSES OF ACTION

### COUNT I:  DEPRIVATION OF LIBERTY INTEREST WITHOUT DUE PROCESS OF LAW
Art. 12 of the Massachusetts Declaration of Rights and 42 U.S.C. § 1983

### CAHILL vs. SNOW, PATCH AND BRULOTTE

47.  The plaintiffs reallege and incorporate paragraphs 1 through 46 herein as though set forth verbatim.

48.  Cahill has a constitutionally protected liberty interest in her reputation.

49.  The defendants have publically made stigmatizing statements against Cahill in connection with an alteration of her employment status, and have failed to honor her request for a fair hearing.

50.  The defendants' statements about Cahill have seriously damaged her standing and associations in her community, and have placed her good name and reputation at stake.

51.  Cahill's due process rights under Article 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment of the United States Constitution entitle her to a fair name-clearing hearing where she is given the opportunity to refute the false charges that have been made against her.

52.  Cahill has no adequate remedy at law.

53.  The balance of the equities favors Cahill rather than the defendants, and she has a high probability of success on the merits of their case.

54.  Should the hearing proceed with the defendants serving as judges, the likelihood of irreparable harm to Cahill is great, as the subsequent media attention will further damage her reputation in the community.  See Exhibits J and K (newspaper articles concerning Cahill and Kingsley's suspension).  Furthermore, the deprivation of Cahill's constitutional right to a fair and impartial hearing constitutes irreparable harm.

55.  In comparison, the defendants carry little risk of harm should the Court grant the relief that Cahill seeks, and are unlikely to succeed on the merits of their case.

56.    WHEREFORE, Cahill respectfully demands that this Court:

a)    grant a temporary restraining order prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

b)    grant a preliminary injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

c)    grant a permanent injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

d)    grant a short order of notice for the hearing of this case; and

e)    grant such other relief as the Court deems just and proper.

### COUNT II:  DEPRIVATION OF PROPERTY INTEREST WITHOUT DUE PROCESS OF LAW
### Art. 12 of the Massachusetts Declaration of Rights and 42 U.S.C. § 1983

### CAHILL vs. SNOW, PATCH AND BRULOTTE

55.    The plaintiffs reallege and incorporate paragraphs 1 through 54 herein as though set forth verbatim.

56.    Section 6(L)(b) of the Town of Bernardston Personnel Policies and Procedures, stating that employees may be discharged for cause, gives Cahill a constitutionally protected property interest in her job.

57.    Cahill's due process rights under Article 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment of the United States Constitution entitle her to a fair hearing with an impartial decision-maker.

58.    Cahill has no adequate remedy at law.

59.    The balance of the equities favors Cahill rather than the defendants, and she has a high probability of success on the merits of their case.

60.    Should the hearing proceed with the defendants serving as judges, the likelihood of irreparable harm to Cahill is great, as the subsequent media attention will further damage her reputation in the community.  See Exhibits J and K.  Furthermore, the deprivation of Cahill's constitutional right to a fair and impartial hearing constitutes irreparable harm.

61.    In comparison, the defendants carry little risk of harm should the Court grant the relief that Cahill seeks, and are unlikely to succeed on the merits of their case.

62. WHEREFORE, Cahill respectfully demands that this Court:

    a)    grant a temporary restraining order prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

    b)    grant a preliminary injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

    c)    grant a permanent injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

    d)    grant a short order of notice for the hearing of this case; and

    e)    grant such other relief as the Court deems just and proper.

## COUNT III: DEPRIVATION OF PROPERTY INTEREST WITHOUT DUE PROCESS OF LAW
### Art. 12 of the Massachusetts Declaration of Rights and 42 U.S.C. § 1983

### KINGSLEY vs. SNOW, PATCH AND BRULOTTE

63. The plaintiffs reallege and incorporate paragraphs 1 through 62 herein as though set forth verbatim.

64. Section 6(L)(b) of the Town of Bernardston Personnel Policies and Procedures, stating that employees may be discharged for cause, gives Kingsley a constitutionally protected property interest in his job. See Exhibit L.

65. Furthermore, the fact that Kingsley was appointed to his position for a fixed and definite term gives him a constitutionally protected property interest in his job. See Exhibit M.

66. Kingsley's due process rights under Article 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment of the United States Constitution entitle him to a fair hearing with an impartial decision-maker.

67. Kingsley has no adequate remedy at law.

68. The balance of the equities favors Kingsley rather than the defendants, and he has a high probability of success on the merits of their case.

69. Should the hearing proceed with the defendants serving as judges, the likelihood of irreparable harm to Kingsley is great, as the subsequent media attention will further damage his reputation in the community. See Exhibits J and K. Furthermore, the

-8-

deprivation of Kingsley's constitutional right to a fair and impartial hearing constitutes irreparable harm.

70.  In comparison, the defendants carry little risk of harm should the Court grant the relief that Kingsley seeks, and are unlikely to succeed on the merits of their case.

71.  WHEREFORE, Kingsley respectfully demands that this Court:

a)  grant a temporary restraining order prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

b)  grant a preliminary injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

c)  grant a permanent injunction prohibiting the defendants from sitting as judges at the public hearing and ordering the appointment of an unbiased decision-maker;

d)  grant a short order of notice for the hearing of this case; and

e)  grant such other relief as the Court deems just and proper.

Respectfully submitted,

THERESA CAHILL,
Plaintiff,
By her attorneys,
The Law Firm of Edward F. Berlin
By:
Edward F. Berlin, BBO # 039900
Cole Thaler, BBO # 654904
20 Federal Street, Suite 5
Greenfield, MA 01301-3302
Telephone   (413) 774-4800
Facsimile   (413) 772-2558

MERLE KINGSLEY,
Plaintiff,
By his attorney,

Alexander Z. Nappan, BBO # 366900
32 Bray Road
Shelburne Falls, MA 01370
Telephone   (413) 625-1081

Dated: January 13, 2004

Verified Complaint

I hereby swear, under the pains and penalties of perjury, that the facts contained in this complaint are true to the best of my knowledge.

Merle Kingsley
Dated:  January 13, 2004

Theresa Cahill
Dated:  January 13, 2004

-9-

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a copy of the foregoing Complaint has this day been served on the defendants by first class mail, postage prepaid, to John Patch, Chair of the Bernardston Board of Selectmen and Bernardston Town Clerk, at 11 Harwood Drive, Bernardston, MA 01337. The undersigned further certify that a copy of the foregoing Complaint was delivered via first class mail, postage prepaid, to the defendants' attorney, David Jenkins, Esq., Kopelman and Paige, P.C., 31 St. James Avenue, Boston, MA 02116-4102.

Dated: January 13, 2004            By:    _____
                                          Edward F. Berlin, Esq.

Dated: January 13, 2004            By:    _____
                                          Alexander Z. Nappan, Esq.

# Exhibit A



**The Commonwealth of Massachusetts**

**Office of the Inspector General**

ROBERT A. CERASOLI
INSPECTOR GENERAL

JOHN W. McCORMACK
STATE OFFICE BUILDING
ROOM 131
TEL (617) 727-9140
FAX (617) 723-2334

MAILING ADDRESS:
STATE HOUSE STATION
P.O. BOX 270
BOSTON, MA 02133

March 23, 2001

Judith A. Beckwith, Treasurer
Town of Bernardston
P.O. Box 435
Bernardston, MA 01337

Dear Ms. Beckwith:

This Office received a complaint regarding the procurement of sand by the Town of Bernardston. Specifically, the allegation is that the Town is procuring sand from someone other then the lowest responsive and responsible bidder who was awarded the contract by the Franklin Regional Council of Government on behalf of the Town.

M.G.L. c. 30B, §5 requires a jurisdiction to award a contract to the lowest responsive and responsible bidder. In addition, M.G.L. c. 30B, §17(b) states that contracts awarded in violation of this chapter are invalid and unenforceable, and no further payment may be made on the contract. See also *Majestic Radiator Enclosure Co. v. Middlesex*, 397 Mass. 1002 (1986).

As such, this Office requests that you withhold making any further payments for the procurement of sand until this Office completes its investigation of this matter. Thank you for your cooperation. If you have any questions, please feel free to contact me.

Sincerely,

Heidi E. Zimmerman
Deputy General Counsel

cc: William H. Shores, Chairman, Board of Selectman

# Exhibit B



## The Commonwealth of Massachusetts

### Office of the Inspector General

ROBERT A. CERASOLI
INSPECTOR GENERAL

May 22, 2001

JOHN W. MCCORMACK
STATE OFFICE BUILDING
ROOM 1311
TEL: (617) 727-9140
FAX: (617) 723-2334

MAILING ADDRESS
STATE HOUSE STATION
P.O. BOX 270
BOSTON, MA 02133

Ms. Janice A. Leh
Chair, Board of Selectman
Town of Bernardston
P.O. Box 435
Bernardston, MA 01337

Dear Ms. Leh:

I am writing concerning the Town of Bernardston's (Town) purchase of sand from Cersosimo Industries, Inc. (Cersosimo) during the winter months of 2001. It is this Office's opinion that this contract was procured in violation of M.G.L c. 30B.

With the assistance of the Franklin Council of Regional Governments (Council), the Town competitively procured sand. The Town anticipated that it would need approximately 2,500 tons of sand costing approximately $10,000.[1] M.G.L. c. 30B, §5(g) requires that the procurement officer award the contract to the lowest responsible and responsive bidder. According to the Council, the lowest responsive and responsible bidder for the Town's needs was Robert Mitchell. Mr. Mitchell bid a price of $3.80 per ton. Cersosimo, the second lowest bidder, bid a price of $3.95 per ton. According to the Council, it informed the Town that Mr. Mitchell was the lowest bidder and, in its opinion, was responsive and responsible. In addition, the Council requested that the Town notify it if the Town had any issue with awarding the contract on the Town's behalf to Mr. Mitchell. The Town did not respond and the Council executed a contract with Mr. Mitchell.

Based on documents submitted to this Office by the Town, the Bernardston Highway Department (Department) obtained its own price quotations, apart from the Council's collaborative bid.[2] M.G.L. c. 30B, §4(b) requires that the procurement officer award the contract to the responsible person offering the needed quality of supply or service at the

---

[1] Normally, the procurement of a supply costing $5,000 or more but less than $25,000 would be procured following M.G.L. c. 30B, §4 (quotations). However, because this procurement was done as a part of a collaborative bid valued at over $25,000 it was done following M.G.L. c. 30B, §5 (bids).
[2] A jurisdiction may choose to do its own competitive process rather than take advantage of a collaborative bid provided that the arrangement between the jurisdiction, and collaborative and the invitation for bid permits separate procurements.

lowest price. According to records submitted by the Department, the following price quotations were obtained on October 17, 2000 and October 19, 2000: Robert Mitchell-$3.80 per ton; Cersosimo Industries-$3.85 per ton; and Warner Brothers-$4.25 per ton. The individual in charge at the Department informed this Office that these price quotations were based on an estimated quantity of 2500 tons of sand.

On March 3, 2001, this Office received a complaint alleging that the sand was improperly procured from Cersosimo. Through conversations with Selectman Shores and the individual in charge at the Department, it was established that the Department, in violation of M.G.L. c. 30B, purchased $5,708.07 worth of sand from Cersosimo. The individual in charge of the Department stated that he purchased the sand from Cersosimo because the Department had done business with this company in the past and was very happy with their product. The Department's decision to pass over Robert Mitchell was not based on a determination that this contractor was not responsive or not responsible. As such, the Town's procurement of sand from Cersosimo is invalid and no further payments may be made on the contract. M.G.L. c. 30B, §17(b).

In an attempt to avoid this sort of problem in the future, please note that this Office provides telephone technical assistance to procurement officials Monday through Friday. Town officials may contact this Office and ask to speak with a M.G.L. c. 30B attorney for answers to procurement questions. The Town may also submit any invitations for bids for a M.G.L. c. 30B compliance review prior to advertising. Additionally, this Office also offers courses in public procurement through the Massachusetts Certified Public Purchasing Official (MCPPO) program. Enclosed please find a catalog. If you or any Town officials have additional questions, please feel free to contact me.

Sincerely,

Heidi E. Zimmerman
Deputy General Counsel

cc:    Judith Beckwith, Treasurer

# Exhibit C



The Commonwealth of Massachusetts

Office of the Inspector General

GREGORY W. SULLIVAN
INSPECTOR GENERAL

JOHN W. McCORMAC(
STATE OFFICE BUILDING
ONE ASHBURTON PLACE
ROOM 1311
BOSTON, MA 02108
TEL: (617) 727-9140
FAX: (617) 723-2334

Mr. John C. Patch, Chairman                    December 9, 2003
Board of Selectman
Town of Bernardston
11 Harwood Drive
Bernardston, MA 01337

Dear Sir:

This letter pertains to the Town of Bernardston's (Town) agreement to purchase sand from Cersosimo Industries, Inc. (Cersosimo) in the fall of 2000. In March 2001, a complaint was made to this Office concerning the Town's award of the sand contract to Cersosimo. The complaint alleged that the sand procurement violated the provisions of M.G.L. c. 30B. Following the complaint, this Office conducted an initial inquiry to obtain the facts concerning the award of the sand contract to Cersosimo. This Office contacted a member of the Town's Board of Selectman and the Town Highway Superintendent. During the initial inquiry, this Office learned that in the fall of 2000, the Town participated in a collaborative bidding process for the purchase of sand with the assistance of the Franklin Council of Regional Governments (FCRG). The FCRG, on behalf of Bernardston and several other municipalities, solicited competitive bids for the purchase of sand. The lowest responsive and responsible bidder was Robert Mitchell (Mitchell) at $3.80 per ton. Cersosimo was the second lowest bidder at $3.95 per ton. The FCRG notified the Town that Mitchell was the lowest responsive and responsible bidder and requested that the Town notify them if the Town had any problem with awarding the contract to Mitchell. The Town did not respond and the contract was awarded to Mitchell.

In 2001, this Office spoke with the Highway Superintendent who claimed that he decided not to participate in the sand contract awarded by the FCRG to Mitchell and instead initiated a separate quote process for the sand procurement. The Highway Superintendent provided to this Office a document entitled "Chapter 30B Telephone Bid Sheet" (Telephone Bid Sheet) which recorded the following quotes that were purportedly obtained by the Superintendent on 10/19/00:    Robert Mitchell - $3.80 per ton; Cersosimo Industries, Inc. - $3.85 per ton; and Warner Brothers - $4.25 per ton. When asked why he had rejected the low bidder, Mitchell, he replied that Mitchell was not a responsible bidder, that he (the Highway Superintendent) had gotten bad references on Mitchell from the towns of Brattleboro, VT and Erving, MA. He also said that he liked

Cersosimo Industries, Inc. with whom he had done business for several years. It was subsequently determined that Mitchell had not done business with either Brattleboro, VT or Erving, MA prior to October 2000. Moreover, this Office received information that raised serious doubt about whether Warner Brothers had ever tendered a quote at all during the so-called quote process as reflected on the Telephone Bid Sheet.

The Highway Superintendent was subsequently informed that this Office had determined that Mitchell had not done business with Brattleboro or Erving in the past and he responded by stating that there had been a miscommunication. He said that he awarded the contract to Cersosimo because he had done business with them in the past and that he liked them. Following our initial inquiry, this Office sent a letter to the Chairman of the Bernardston Board of Selectman.[1]  This letter, dated May 22, 2001, declared the award of the Fall 2000 sand contract to Cersosimo to be invalid and a violation of M.G.L. c. 30B.

In May 2003, documents were received by this Office which suggested that there may have been an attempted cover-up in this matter. One of these documents, dated 9/13/00, was entitled "Bid Notice/Town of Bernardston/Highway Sand Bid" (Bid Notice). It requested sealed bids for approximately 2,500 tons of winter sand, which would be opened at the Board of Selectmen's Office in Bernardston on 10/11/00. A second document, dated 10/12/00, was an unsigned letter to the Bernardston Board of Selectmen from the Highway Superintendent stating that he would like to choose the Cersosimo Industries, Inc. bid over that of Mitchell because of the quality of the sand, even though the Cersosimo Industries bid was five cents more a ton. Accompanying these documents was a printout of a computer directory which showed that the two documents described above had been last saved on the computer on 3/26/01. The date, 3/26/01, is significant because it follows closely the date, 3/23/01, when this Office addressed a letter to the Town Treasurer directing her to withhold payments for the procurement of sand because it appeared that the Town was procuring sand from someone other than the lowest responsive and responsible bidder. This letter also mentioned that this Office had received a complaint about the sand contract and would be conducting an investigation into the matter. A copy of this letter was also sent to a member of the Board of Selectmen. It appeared as though the documents could have been created in response to this Office's letter dated 3/23/01 rather than on the dates reflected on the documents.

In the fall of 2003 this Office conducted further investigation into the Town's sand procurement conducted in the fall of 2000. Further investigation was deemed warranted because the documents mentioned above, dated 9/13/00 (the Bid Notice) and 10/12/00 (the unsigned letter from the Highway Superintendent) appeared to have been created on 3/26/01. This was long after the sand contract was awarded and immediately following this Office's letter, dated 3/23/01, to the Town Treasurer and a Selectman indicating that an investigation would be conducted. Moreover, the dates on these two documents failed to correspond with the dates set forth on the Telephone Bid Sheet, which involved the

---

[1] The Chairman of the Board of Selectmen at the time of the letter is not the current Chairman and no longer serves as a Town Selectman.

2

quote process for the purchase of sand. The Telephone Bid Sheet disclosed that three quotes were obtained by the Highway Superintendent for sand on 10/19/00. If the 10/19/00 quote process was legitimate, the document dated 9/13/00 which referred to a sealed bid process on 10/11/00 and the document dated 10/12/00 regarding the Highway Superintendent's intention to choose Cersosimo appeared to be falsified and required explanation. Accordingly, this Office conducted interviews with the Administrative Assistant to the Board of Selectmen (Administrative Assistant), the Highway Superintendent, and a former member of the Town's Board of Selectmen.

The Administrative Assistant was interviewed on 11/21/03 and initially stated that the Town chose not to follow the FCRG collaborative contract for the purchase of sand in the fall of 2000 because the quality of sand provided by Cersosimo was better than the low bidder. She advised that the sand procurement **was not put out to bid after the Town chose not to accept the FCRG's low bidder (Mitchell)**. She recalled that the Selectmen nonetheless used the bids submitted to the FCRG in deciding to award the sand contract to Cersosimo.[2] The Administrative Assistant was shown a copy of the Telephone Bid Sheet which disclosed that three parties including Cersosimo, Mitchell and a third vendor had submitted quotes to supply sand to the Town on 10/19/00. She identified her signature on the document and identified handwriting pertaining to the quotes as belonging to the Highway Superintendent. She admitted for the first time that she gave this document to the Board of Selectmen.[3]

During the interview, she provided to investigators an official file, which upon examination, revealed a document entitled "Agreement." This document was created by Cersosimo Industries, Inc. The document was dated 10/11/00 and in it, Cersosimo agreed to furnish sand to Bernardston at the rate of $3.85 per ton. The Administrative Assistant was at a loss to explain the contradictions between her initial statements to investigators concerning the sand procurement process and the Telephone Bid Sheet disclosing the quote process on 10/19/00. She was also unable to explain the "Agreement" document showing that Cersosimo had an agreement with the Town to purchase sand on 10/11/00, over a week before the so-called quote process was initiated.

The Administrative Assistant was shown the documents furnished to this Office which suggested the possibility of a procurement cover-up. As explained above, these documents included a "Bid Notice" from the Town, dated 9/13/00 in which sealed bids for the procurement of sand were solicited. The document shows that the return date for the sealed bids was to be 10/11/00. The documents also included an unsigned letter from the Highway Superintendent to the Town Selectmen, dated 10/12/00, which indicated that he would like to choose Cersosimo for the sand procurement because his sand is better quality than Mitchell's. In addition, there was a document that contained a printout of a computer directory which disclosed that the above mentioned "Bid Notice" and the unsigned letter had been last saved on 3/26/01. As reflected above, this Office sent a letter dated 3/23/01 to Town officials indicating that an investigation was being

---

[2] The Cersosimo bid to the FCRG was $3.95 per ton and the Mitchell bid to the Council was $3.80 per ton.
[3] It should be noted that prior to being shown this document, she stated that the sand contract was not put out for bids after the Town opted out of the FCRG's bidding process.

conducted by this Office into the Town's 2000 purchase of sand. After looking at these documents, the Administrative Assistant admitted that she created these documents and that they were on her office computer. She advised that the letter dated 10/12/00 purportedly from the Highway Superintendent to the Board of Selectmen was actually created by her on 3/26/01 at the direction of one of the Selectman[4] because there was a bid protest and it had to be shown that "we" had gone out and gotten quotes and had acted in good faith regarding the quality of sand. Moreover, she explained that the document dated 9/13/00, the request for sealed bids, was also generated by her on 3/26/01 at the direction of the same Selectman. He wanted her to create the documents because Mitchell protested the bid award. This protest came shortly before the documents were created. She stated that this Selectman had spoken with an employee of this Office and he said that "we" needed to put some stuff in the files and he told her to produce these documents on 3/26/01.[5] Her admissions lead to the inescapable conclusion that she and the Selectman participated in a potential cover-up in the event that these documents were later needed to justify the procurement of sand from Cersosimo.

The Highway Superintendent was interviewed on 11/21/03 and initially claimed that he went through the "county" bid process ( i.e., the Franklin Council of Government's collaborative bid process) for the purchase of sand in the year 2000. He claimed that he recommended to the Board of Selectmen that they chose Cersosimo to supply the sand in 2000 even though Cersosimo was not the low bidder in the "county" bid process. He denied ever soliciting bids himself from Cersosimo for the sand procurement in 2000.

The Superintendent was shown a copy of the Telephone Bid Sheet, which reflected that a quote for the purchase of sand was obtained from Cersosimo on 10/19/00. He admitted that the handwriting on the Bid Sheet was his and admitted that he was the one who solicited the quotes reflected on the Telephone Bid Sheet. He claimed that he brought the Telephone Bid Sheet to the Board of Selectmen and they awarded the sand contract to Cersosimo. In the face of his contradictory statements to investigators and the documentary evidence presented, the Highway Superintendent was asked to explain what really happened with the 2000-sand procurement. For the first time, he revealed what really occurred. He advised that he did not want to go through a bidding process to buy sand in the fall of 2000. He explained that when the FCRG sent out the sheet for him to specify the amount of sand that he would need, he did not fill it out and return it to the FCRG. Instead, he went ahead and arranged to buy sand through an employee from Cersosimo Industries without a bidding process. He advised that without his knowledge, the FCRG's Chief Procurement Officer put Bernardston on the bid sheet anyway.[6] He advised that he had already agreed to purchase sand from Cersosimo and was shocked

---

[4] This was the same Selectman that was notified by this Office by letter dated 3/23/01 that an investigation was being conducted by this office into the 2000-sand procurement.

[5] It should be noted that during this interview, investigators asked the Administrative Assistant to produce the procurement file for the purchase of sand from Cersosimo for the year 2000. She was unable to locate it and permitted investigators to look in her file cabinets for it as well. This search was not productive.

[6] This action by the Chief Procurement Officer effectively included the Town of Bernardston in the collaborative bidding process for sand, even though the Highway Superintendent did not wish to participate.

when he later saw the FCRG bid sheet. He put together the Telephone Bid Sheet after he received the county (FCRG) bid sheet.[7]

A former Selectman was interviewed and categorically denied that he directed the Administrative Assistant to prepare the false documents dated 9/13/00 and 10/12/00. He said that he would never do anything like that and would never cover up. He said that he was not aware that the FCRG gave the sand contract to Mitchell. He said that the Highway Superintendent told him that Mitchell was a questionable source and that he liked Cersosimo Industries product and service.     He stated that the Highway Superintendent would come into the Selectmen's meeting and advise them that the Cersosimo bid was five cents higher than the lowest bid and that there was a problem with Mitchell.   He advised that Mitchell's lawyer made a complaint to the Town regarding the sand procurement and the Town made a payment to Mitchell's lawyer. He said he did not know why the Town paid the money. [8]

It is clear that, in the fall of 2000, the Town's Highway Superintendent deliberately violated the bidding process as mandated by Chapter 30B by purchasing sand from Cersosimo Industries, Inc. through a sole source procurement in violation of M.G.L. c. 30B. The Highway Superintendent admitted to engaging in a sham quote process and to creating a Telephone Bid Sheet after he had already reached a sole source agreement with Cersosimo for the purchase of sand. In this Office's opinion, that this was done to cover-up his illegal conduct and to demonstrate that he had followed the proper procedures. Furthermore, the Highway Superintendent in 2001 faxed the Telephone Bid Sheet to this Office in response to an official inquiry and falsely led an employee of this Office to believe that he engaged in a legitimate quote process for the purchase of sand in 2000. In addition, this Office was informed by Mitchell's Attorney that one of the quotes listed by the Highway Superintendent on the Telephone Bid sheet was never in fact made.   Moreover, this Office believes that the Highway Superintendent deliberately attempted to mislead an employee of this Office during the initial investigation of the sand procurement in 2001 by falsely claiming that he had checked two references for the low bidder and found the low bidder's work to be unsatisfactory.   It is this Office's opinion that the Highway Superintendent initially lied to investigators from this Office when interviewed on 11/21/03.

Likewise, this Office believes that the  Town's Administrative Assistant was either initially grossly mistaken or deliberately misleading in her initial explanation to investigators about the Town's purchase of sand in 2000.  She also admitted creating two false documents, at the direction, she claims, of a former member of the Board of

---

[7] As explained earlier in this letter, this Office has obtained information which indicated that at least one quote on this Bid sheet was never in fact obtained. Even if the quotes were in fact obtained as reflected on the Bid Sheet, this document was created to cover up the fact that the Highway Superintendent had entered into a prior agreement with Cersosimo to supply sand to the Town in violation of the public bidding laws.
[8] This Office is in possession of a letter dated 8/3/01 from the Town Counsel to the particular Selectman discussed above which requested that the Town forward a check for $750.00 to the Town Counsel so that the money could be forwarded to Mitchell's Attorney. The letter states, "In lieu of proceeding with a bid protest hearing in this matter, ...Mr. Mitchell, through his attorney, agreed to settle this matter for payment by the Town of his attorney's fees."

5

561687105429aaf0

Selectman. One document being an invitation for sealed bids and the other a letter from the Highway Superintendent informing the Board of Selectmen that he would like to choose Cersosimo Industries to buy sand. She admitted during interview to creating these documents because there was a bid protest and it had to be shown that "we" had gone out and obtained quotes and had acted in good faith. It is clear that these documents were created after the Town received notice that this Office was conducting an official inquiry into the 2000 sand procurement and was done to cover-up the truth of the matter. Moreover, her inability to find the Cersosimo sand procurement file, in light of all the other information disclosed above, appears to be highly suspicious.

Accordingly, based upon the information set forth above, this Office recommends that both the Town's Administrative Assistant and the Highway Superintendent be terminated from employment by the Town of Bernardston. This Office further recommends that the Board of Selectmen exercise more diligence in the supervision of the Town's procurement process. The facts of this matter disclose not only a flagrant disregard of the public bidding laws by Town officials but also an even more egregious attempt by these officials to cover-up official wrongdoing.

Very Truly Yours,

Gregory W. Sullivan

Gregory W. Sullivan
Inspector General

cc: Ms. Laurie MacLeod Esq.
    Assistant District Attorney