# Exhibit K

# Bernardston board locks out assistant, town highway boss

By JANET BOND
Recorder Staff

BERNARDSTON — The town's administrative assistant and highway superintendent were placed on paid administrative leave following an emergency meeting of the selectmen Friday.

Administrator Theresa Cahill and road boss Merle Kingsley were put on paid administrative leave pending further investigation of charges that are to be considered at a hearing on Tuesday.

According to Mary Lightner, Conservation Commission chairwoman, she saw a locksmith changing the locks on Cahill's office and at the town Highway Department office Friday afternoon.

According to several residents who attended the meeting, Selectmen's Chairman John Patch opened the meeting and took the steno pad from Cahill saying that she would not be taking the notes for this meeting.

Patch then said charges would be brought against Cahill and Kingsley at a formal hearing and the two were put on paid administrative leave effective immediately.

When called by The Recorder after the meeting, Selectman Michael Snow confirmed the charges would be taken up Tuesday and then hung up the phone when asked to elaborate.

Neither Patch, nor Selectman Peter Brulotte returned phone calls requesting information for this story.

Cahill has been administrative assistant to the town's selectmen and the Board of Health for the last 17 years. Kingsley has been the town's road boss for 17 years.

"I asked Jack to elaborate," said Mary Lightner, who was at the meeting, "He said he couldn't."

Lightner said she knew about the meeting because she had gone to Town Hall to post a cancellation of the Conservation Commission meeting and saw the "scrawed note" announcing the emergency selectmen's meeting.

"I'm just amazed at the level of venom. It's beyond the pale and it's based on personalities," said Lightner.

Cahill, when reached after the meeting, said she was at her desk Friday morning when Patch posted the note.

"He came in, I heard the front door. I got up. I saw him leaving. An emergency selectmen's meeting was posted. Before they came in there (for the meeting) there was a locksmith at my door. Before they even

See BERNARDSTON Page 3

> "They won't talk to me. They changed my locks while I am sitting there."
>
> Theresa Cahill
> Bernardston administrative assistant

## Bernardston

From Page 1

voted to put me on paid administrative leave," said Cahill. "I'm embarrassed again and humiliated. They won't talk to me. They changed my locks while I am sitting there."

After the meeting, Patch stood in Cahill's office and watched while she packed her personal belongings.

"Then he escorted me to my vehicle and told me to have a nice weekend. I've worked for this town since 1986, heart and soul, this is clearly personal and vindictive," she said, her voice choking.

Ginger Budness of Huckle Hill Road was at the meeting and was shocked at what had happened.

"When you ask her (Cahill) about something in particular, she has the answer ... The selectpeople depend on her for information," said Budness.

Raymond Perkins of Bald Mountain Road, who was also at the meeting, called the actions "a personal witch hunt. These people are out of control."

There have been many clashes between the selectmen and the Highway Department in the last two years during which time the highway workers joined Teamsters Union local 404. At last report, the town and union had gone to mediation over stalled contract talks.

In August, Kingsley was given a verbal reprimand for not following personnel policy and granting an employee a bereavement day for the death of a distantly related relative.

In April, Selectmen Patch and Snow decided to not reappoint Kingsley to the position of highway superintendent. However, as he was neither fired, nor replaced, the town's lawyer told the board he was still on the job.

In October, Selectmen Patch, Snow and William Shores went over Kingsley's records. The concern was an alleged discrepancy in Kingsley's record keeping.

At the May annual town meeting, Patch put before the town a motion to reduce Cahill's hours from 40 a week to 18 a week. The motion was not reflected in the warrant and was a surprise to nearly all in attendance.

Patch said he had taken a look at the job and thought that in 18 hours a week, the administrative assistant could get all the work done.

"It's an assessment I have made," said Patch when asked at the meeting for any data backing up his analysis.

The motion was defeated.

You can reach Janet Bond at: jbond@recorder.com or (413) 772-0261 Ext.263.

# The Recorder

Wednesday, December 17, 2003 • 50 Cents / 45 Cents Home Delivery • Est. 1792 • Greenfield, Massachusetts • 212th Year, No. 299 • 20 Pages

## Road sand buy at heart of charges

### Bernardston meeting draws more than 100 amid calls for selectmen's resignations

By JANET BOND
Recorder Staff

BERNARDSTON — At least 120 people streamed into the Bernardston Elementary School cafeteria Tuesday to hear the selectmen "read" their charges against two town employees who had been put on paid administrative leave last week.

Inside the school, Mary Lightner was collecting money for the legal fees of administrative assistant Theresa Cahill and Highway Superintendent Merle Kingsley and collecting signatures on a petition demanding the resignation of the selectmen. Signs in the snow outside called for the selectmen to resign.

The selectmen's Tuesday night meeting had begun in town hall but seeing that the room was reaching capacity, the board moved the meeting to the elementary school, a half-mile drive to School Street.

As selectmen's Chairman John Patch reconvened the meeting, he told the audience that the board had received a letter from Inspector General Gregory Sullivan about a matter of sand purchased for the winter of 2000-2001, that the selectmen thought they had resolved in the fall of 2001. The charges brought against Cahill and Kingsley allege violations of the state's bidding process.

Patch, struggling with a cold and a dry mouth, said he'd made 25 copies of the six-page letter and skipped to the end of the letter to read:

"... this office recommends that both the town's administrative assistant and the highway superin-

See SAND back page this section

Recorder/Paul Franz
Bernardston Selectmen Michael Snow and Peter Brulotte listen to Selectman John Patch Tuesday night in Bernardston.

# Sand

**From Page 1**

tendent be terminated from employment by the Town of Bernardston. This office further recommends that the Board of Selectmen exercise more diligence in the supervision of the Town's procurement process. The facts of this matter disclose not only a flagrant disregard of the public bidding laws by town officials but also an even more egregious attempt by these officials to cover up official wrongdoing."

With that, Patch told Kingsley he was going to read the charges being brought against him and asked if Kingsley wanted to waive his right to executive session, which Kingsley did.

Penny Ricketts, in attendance as the administrator of the Web site Penrick.com, which has had a running page of commentary on Bernardston politics, offered her services to the selectmen to take the minutes of the discussion.

"Don't you have a problem taking your own minutes for this?" asked Ricketts. Cahill would have taken the selectmen's minutes as administrative assistant.

Patch accepted, gestured to the chair next to him, and Selectman Michael Snow passed the steno pad down the table to Ricketts.

Patch read the charges to Kingsley, listing the alleged violations of the bidding process. Kingsley, who did not have a lawyer with him, picked up his copy of the charges and a copy of the letter from the inspector general.

Cahill also requested an open hearing of the charges being brought against her and Patch read the charges against Cahill which included allegedly violating the bidding process and allegedly misleading the inspector general's office investigators and providing them with inaccurate information.

In the fall of 2000, the Franklin Regional Council of Governments collected bids for sand and awarded the contract to the lowest bidder, Robert V. Mitchell of Rob Mitchell Trucking Inc. in Shelburne.

According to William Shores, who attended Tuesday's meeting and was a selectman at the time of the bids, the town didn't want the sand from Mitchell because the board thought the sand was of a poorer quality.

"We chose Cersosimo sand over Mitchell," said Shores. The Cersosimo sand cost 5 cents more per ton, a difference to the town of about $125.

In March 2001, the Inspector General's Office received a complaint about the way the town had chosen its winter sand provider. The town got a letter from a lawyer in the IG's office stating that the town was in violation of Chapter 30B, state laws that govern bidding.

The town paid $750 to Mitchell for his legal fees and said that it would follow the procurement laws, according to the June 2001 letter signed by Shores as chairman, Selectman Janice Leh, and Patch, who was in his first year on the board.

At the request of Cahill's lawyer, Edward Berlin, the hearing was changed from Dec. 30 to Jan. 7 at a time yet to be determined.

Both Kingsley and Cahill were told their hearing could result in their dismissal.

During Tuesday night's discussion of the charges, resident Faith Rockwood asked who had brought the matter back to the attention of the Inspector General's Office after it had been settled.

"They were notified by myself," said Patch, who told the group that he had been backing up the computer files in Cahill's computer.

"In the process of backing up the files, I found one that said 'sand,' so I opened it. The first page had nothing to do with sand, it had to do with buying a truck. So I went to the second page. That document didn't look right. I did some research. It didn't fit the story that had been told to everybody. I sent the documents to the Inspector General."

"It was settled. That's right. When I found something unlawful, I pursued it," he added.

There were other questions about whether other employees had broken the law, but Patch was certain.

He said no other employees had access to the "Board of Selectmen's computer" and "no other employees violated the law."

Berlin stood up to challenge Patch and reminded him that the board was only presenting allegations, but that Patch had just said, "she [Cahill] broke the law."

Berlin asked Patch whether, given what he had just said, he was capable of holding a hearing that was supposed to be a fair and open process, with an open mind.

When Patch tried to deny that he had said Cahill broke the law, he was interrupted by Ricketts who picked up the steno pad to read back what he had said. Members of the audience also protested his denial.

Patch told the group that he would be able to hold a fair hearing with an open mind.



Recorder/Paul Franz
Bernardston's administrative assistant Theresa Cahill, in red, and Highway Superintendent Merle Kingsley, in blue with arms folded, listen to charges brought against them at the Bernardston Elementary School Tuesday night. Next to Cahill is her lawyer, Edward Berlin.

You can reach Janet Bond at:
jbond@recorder.com
or (413) 772-0261 Ext.263.

# The Recorder

WEEKEND EDITION

Saturday & Sunday, December 20 & 21, 2003 • Greenfield, Mass. • 50 Cents / 45 Cents Home Delivery  212th Year - No. 302  28 Pages

Est. 1792

## Report outlines Bernardston coverup

### But former selectman's involvement still a question

Recorder Staff

BERNARDSTON — A report concluding that town officials violated bidding laws in the fall of 2000 — and then fabricated documents to try to hide the fact from state investigators — has been referred to the district attorney for possible criminal investigation.

The two employees have admitted their actions to investigators, but still at issue is whether, as "one ordered" Administrative Assistant Theresa Cahill to fabricate back-dated documents after he "learned the inspector general was investigating.

Also at issue is whether Shores alleges, the order for her to mislead the state came from their then-boss, ex-selectman's Chairman William Shores. The inspector general has concluded that the town administrative assistant and highway superintendent tried to hide the fact that the town had purchased road sand without seeking bids, by fabricating documents after the fact, and by lying to investigators.

In a six-page Dec. 9 letter sent to current selectmen Chairman John Patch's home, Inspector General Gregory W. Sullivan reported the findings of his field investigators and his office's recommendations.

That letter was released by Patch Tuesday when Cahill and Highway Superintendent Merle Kingsley were read the IG's allegations and recommendation they be fired. Both have been placed on administrative leave and have personnel hearings scheduled for next month.

Cahill's "admissions lead to the inescapable conclusion that she and the selectman participated in a potential cover-up in the event that these documents were later needed to justify the procurement of sand from Cerrosinno," Inspector General Sullivan says in his letter.

Shores categorically denied the allegation to the investigators and to The Recorder on Thursday.

"I didn't ask her to put out letters. What the hell for? We didn't need them. There was no need of it. Terry made up a folder so it would look like we had something," he told The Recorder. He said that the administrative assistant of 17 years was confused about what happened.

On the advice of their lawyers, neither Cahill nor Kingsley would talk about the said purchase or their subsequent actions.

Renee Steese, first assistant district attorney, said this week she would not confirm or deny the existence of a criminal investigation in this case. A copy of the IG's letter was forwarded to the district attor-

See BERNARDSTON Page 6

6  The Recorder, Greenfield, Mass., Saturday, December 20, 2003

# Bernardston

ney's office.

All the charges involved with violating the procurement law, Chapter 30B, are punishable as misdemeanors, according to the IG's office.

However, John K. McCarthy, senior assistant inspector general, said he did not know what charges the district attorney's office might file.

The IG's letter recounts its probe of the 2000 sand deal and what it concludes was a cover-up. The following is based on the IG's version of events contained in his letter to the selectmen:

In fall of 2000, the town was looking for a sand supplier for the coming winter. The Franklin Regional Council of Governments sought collaborative bids for several area towns, including Bernardston.

But, according to IG's letter, Kingsley didn't want to buy sand from the regional government's low bidder, Robert Mitchell Inc, even though it had been deemed the "lowest responsive and responsible bidder" at $3.80 a ton, because he thought the sand to be of questionable quality.

Subsequently, based on Kingsley's advice, the selectmen decided to buy sand from Cersosimo Industries Inc. of Brattleboro, Vt., at $3.85 a ton. The difference amounted to about $125 for the winter, Shores has said.

Neither Kingsley nor the selectmen ever told the regional government they had a problem with Mitchell as a sand supplier. Instead Kingsley went directly to Cersosimo — without using competitive bidding procedures as required by law.

Mitchell complained to the inspector general in March of 2001, which prompted a probe. As a result, the Cersosimo purchase was invalidated and the town was ordered to

men to follow such laws in the future.

In the course of that initial investigation, the IG determined, Kingsley had produced a document that purported to show he had solicited oral quotes over the telephone from three suppliers before making his recommendation to the selectmen. As in the county bidding, Mitchell was listed as the low bidder in this document and Cersosimo was the second lowest bidder.

Kingsley told investigators he went with Cersosimo because "Mitchell was not a responsible bidder, that he had gotten bad references from the towns of Brattleboro, Vt., and Erving. He also said he liked Cersosimo ... "

It was subsequently determined that Mitchell had not, in fact, done business with either Brattleboro or Erving prior to October 2000. "Moreover," the report continued, "this office received information that raised serious doubt about whether (third bidder) Warner Brothers had ever tendered a quote at all during the so-called quote process as reflected on the Telephone Bid Sheet."

Following these discoveries the IG's office declared the fall 2000 sand contract to be invalid, the town paid $750 to Mitchell and the matter apparently was closed — until this fall.

What the Inspector General's Office didn't have during its investigation in the winter of 2001 was evidence that Kingsley and Cahill had independently fabricated documents when they heard about the first investigation.

The IG's latest probe concludes that Kingsley and Cahill both created documents for separate, and it turns out, contradictory, cover-up stories.

In May of this year, Selectman

September and October of 2000, but a copy of the computer directory in which the records were found indicated they were written in March 2001, three days after the IG initially expressed an interest in the sand deal.

Patch said he discovered the computer documents when he was backing up Cahill's computer files this year.

Specifically, according to Sullivan's letter, the two documents were a sand bid invitation from the town dated Sept. 13, 2000, and an unsigned letter supposedly from Kingsley to selectmen, dated Oct. 12, 2000, explaining why he wanted to buy sand from Cersosimo, based on the results of sealed bids that supposedly came in Oct. 11.

According to the inspector general, Cahill admitted to creating the letters in 2001 and said she had done it at the behest of Shores, then chairman of the Board of Selectmen.

"He (Shores) wanted her to create the documents because (low bidder Robert) Mitchell protested the bid award ... She stated that this selectman had spoken with an employee of this office and he said that 'we' needed to put some stuff in the files and he told her to produce these documents on 3/26/01," the IG's letter says.

The letter goes on to say "It is clear that these documents were created after the town received notice that this office was conducting an official inquiry into the 2000 sand procurement and was done to cover up the truth of the matter."

Further evidence of alleged wrongdoing cited by the inspector general's letter is a document found in town records dated Oct. 11, 2000, in which Cersosimo agreed to furnish sand to Bernardston at $3.85 a

# From Page

ton. That date was the day Cahill sham bids were supposedly due — a week before Kingsley's telephone quotes were supposedly solicited.

The Cahill documents found this year led investigators to also question the validity of Kingsley's telephone bid quotes that he originally showed investigators in 2001.

According to the IG: "It is clear that in the fall of 2000, the town highway superintendent deliberately violated the bidding process ... by purchasing sand from Cersosimo Industries Inc. through a sole source procurement ... (he later) admitted to engaging in a sham quote process and to creating a telephone bid sheet after he had already reached a sole source agreement with Cersosimo for the purchase of sand.

"In this office's opinion, this was done to cover up his illegal conduct and to demonstrate that he had followed the proper procedures. Furthermore, the highway superintendent in 2001 faxed the telephone bid sheet to this office in response to an official inquiry and falsely led this employee of this office to believe that he engaged in a legitimate quote process ...

"Likewise, this office believes that the town's administrative assistant was either initially grossly mistaken or deliberately misleading in her initial explanation to investigators about the town's purchase of sand in 2000. She also admitted creating two false documents, at the direction she claims, of a former member of the Board of Selectmen."

The hearing of the town's charges against Cahill and Kingsley will be held on Jan. 7 at a time to be determined.

You can reach Janel Bond at: jbond@recorder.com or (413) 772-0261 Ext.263.

12/18/03

Vigilance or venom? At this time it's hard to say what's the best word to use in describing what's behind the actions of the Bernardston Board of Selectmen.

Right now, there isn't enough information available to fully understand whether the board is right in trying to fire administrative assistant Theresa Cahill and Highway Superintendent Merle Kinglsey.

What the public has for reference at this point is a framework: It began when the state's Inspector General found the town had violated state law when selectmen chose to go with someone other than the low bidder for sand in the year 2000. That, of course, is not the news here. The state received a complaint about the matter in 2001 and informed Bernardston of it later that year. At that time, selectmen paid the low bidder's legal fees and agreed to follow correct procedures in the future.

Two years later, Selectman John Patch, who says he was "in the process of backing up" material on the administrative assistant's computer, opened some files and found something that wasn't to his liking. He told those attending a recent meeting that he did some "research" and then sent his investigation to the Inspector General.

The IG apparently sent back a recommendation that Cahill and Kingsley be fired since there was more to the story than just violating the bidding process. These officials, according to a letter from the IG's office, engaged in some kind of cover-up.

Again, we recognize this is a fraction of the kind of information the public should have in understanding how the Inspector General's office came to its recommendation. Perhaps the hearing on the matter scheduled for Jan. 7 will provide residents — as well as the accused — with the answers.

We hope that information includes answers to the following questions:

◆ How are Cahill and Kingsley connected to what happened with the bid? Since it was selectmen at the time who decided the sand quality wasn't what they wanted, how did these two figure in the decision to go with the more-expensive bidder?

◆ What was the alleged cover-up?

◆ Who was fooled? How was the Inspector General's investigation mislead, since it did determine at that time that the town violated the bidding process?

Maybe under usual circumstances, the public wouldn't worry about extraneous factors when it comes to uncovering potential wrongdoing. But Bernardston's recent history when it comes to personnel matters shows there are problems in decision-making and how it's handled by selectmen.

In this specific case, whether Cahill and Kingsley were involved in any kind of unethical or wrong behavior is complicated because of the frayed relationship the two have with selectmen, specifically John Patch.

It's no secret that earlier this year two of the three selectmen on the board decided they didn't want to re-appoint Kingsley as highway superintendent. But the board didn't take official action nor did it name a replacement and Kingsley has continued to handle those duties.

And it was Patch, after all, who headed the failed attempt to have the administrative assistant's position cut back from full time to 18 hours at town meeting.

This puts Patch and the rest of the board in an awkward position, even if they are completely correct in the action they're taking.

We don't see how this situation is going to disappear quickly or quietly. Bernardston residents, however, should insist that the matter be handled correctly, with full public disclosure of the facts.

■ **The Issue:**
Two Bernardston employees come under scrutiny.

■ **Our opinion:**
At this time plenty of questions remain as to what happened and what is going to occur. Bernardston residents must make sure there is full disclosure of the facts.



The Recorder
Tip of the iceberg

Kay Berenson, publisher
Timothy A. Blagg, editor
T...hin Abelson, editorial page editor

The editorial below represents the opinion of the Editorial Board. We invite other opinions for publication as Letters to the Editor or as My Turn columns.

# Bernardston's latest brouhaha

## Selectmen's approach adds to the intrigue

Not to put a cramp in everybody's yuletide fun, but can you believe what is going on in Bernardston? I'm sure I'm not the only nonresident who's been riveted by the events of the past week, which couldn't have happened at a more inopportune time in a more unlikely place. After all, Bernardston isn't exactly a Tammany Hall-type political hot spot. It's about as quiet a town as you will find in that regard. I know because I lived there for five years in the 1990s and the most political thing that I ever saw happen was the occasional selectmen's candidate greeting residents at the town landfill, which for some reason is a big campaign hot spot in a lot of towns without curbside trash pickup.

Those days of peace and quiet appear to be over now. And while I don't claim to be an expert on every aspect of Bernardston politics, you don't have to have the last name of Cushman, Streeter or Shores to recognize that something has gone rotten along the banks of the Falls River. In just the last year, this town has managed to elect the same person to the position of town clerk and selectmen, had two police chiefs resign, one within 30 days of his hire and has most recently seen its highway superintendent and administrative assistant suspended. Add to that a Board of Selectmen with a reputation for being somewhat heavy handed micromanagers and you've got the makings of an old fashioned political powder keg — one that has already caused a few explosions among a group of residents who are convinced that the long-term goal of these particular selectmen is to take complete control of the town, department by department.

The latest flare-up happened last week with the suspensions of administrative assistant Theresa Cahill and highway superintendent Merle Kingsley. This action was the center focus of a donnybrook of a selectmen's meeting this past Tuesday night. There, Bernardston selectmen Jack Patch, Mike Snow and Peter Brulotte trotted out a series of charges against Cahill and Kingsley related to a 2001 sand bid where Kingsley allegedly flouted the state's procurement laws and Cahill allegedly helped cover it up by falsifying records.

The charges will be the subject of a pair of hearings Jan. 7. But the way the whole matter was handled has provided some revealing insight into the way this particular board conducts its business.

It's not uncommon for selectmen to be careful with regard to procurement issues. Even though those laws which force towns to take the low bidder on projects are perceived by many to be antiquated and counter-productive — the recent Greenfield Middle School renovation being the prime example



**Chris Collins
In the Arena**

— it is still the law of the land, and one which can get a town in serious trouble if the powers-that-be don't keep a close eye on what they are doing. But it's not just the policy-makers that need to worry. Procurement issues can also be a big bear-trap for department heads, especially if they happen to work for a board of selectmen where one or more members is interested in showing them the door. I'm not saying that's the case here. But all we do know from Tuesday's hearing is that Patch was the one who discovered the alleged sand bid impropriety while apparently backing up town data on the selectmen's office computer. He immediately forwarded the information to the state Inspector General's Office, which launched an investigation that led to a six-page letter recommending that Kingsley and Cahill be fired.

Even though he was fully within his rights to handle the situation as he saw fit, Patch's actions raise a couple of interesting questions, namely why he would go to the state instead of confronting Kingsley directly. And probably more to the point, why did he not approach or confront the selectmen who originally approved the bid and were therefore legally responsible for any inconsistencies contained therein? Patch indicated Thursday that he went to the IG because that's the state agency that deals with questions of improper procurement conduct. His critics, however, say the chairman's actions were part of a deliberate effort to force Kingsley out of the Highway Department once and for all.

And while it's understandable that they would want to get to the bottom of the issue, the board's handling of the suspensions themselves left something to be desired. This was especially true in Cahill's case. According to last Saturday's Recorder, Cahill had her steno pad taken away at a public selectmen's meeting shortly before being told she was suspended and was sitting in her office while the locks were being changed. Allegations of wrongdoing or not, are you telling me there wasn't a better way to treat a woman who has served Bernardston faithfully for 18 years? Obviously more than 100 other people agreed with that sentiment, judging by the turnout Tuesday night. Contained within that was a smaller group of residents who have a pretty simple demand: they want these three selectmen to resign and be replaced by a group of former selectmen who are apparently willing to come out of retirement and serve.

"There's not one of these guys we can trust," Bernardston resident Faith Rockwood said of Patch, Snow and Brulotte. "We have to remove all three of them because they are in league all together."

Rockwood has her own issues with Patch. She lost to him in the town clerk's race, and has since been going to selectmen's meetings, where she's had a couple of run-ins with both Patch and other board members. Given what we heard Tuesday, my guess is more such altercations will be forthcoming, both from Rockwood and others who agree with her thinking.

And as bad as that may be for Patch and Co., that's by no means their only problem. Another is Cahill's attorney, Ed Berlin, who appears geared up for a fight that may just wind up in district court before the final bell is rung.

"We want a fair opportunity to be heard," Berlin said. "When the chair of the Board of Selectmen talks about what type of discipline they are going to impose and makes a statement, without ever having a hearing, that my client broke the law, there is certainly a suggestion here that (the selectmen) have a closed mind on this issue."

If that's true, they might be best served by opening their minds quickly, and long before Jan. 7. But even if Patch, Snow and Brulotte do manage to send Kingsley and Cahill packing, that will not alter the fact that waiting in the wings will be an increasingly angry and motivated electorate looking to make a little regime change of her own.

"(The residents) are totally ticked off," Rockwood said. "We've lost (police chief) Ed Demarco, (new police chief) Patrick Kenney, now Merle and Terry are suspended and there's micro-managing going on in the highway department and the police department ... it's just ridiculous. Most of the people who have signed these petitions want them out."

That's the feeling today. But when the smoke from this latest blow-up clears, I can't help but wonder if Bernardston will wind up sliding back into the same politically apathetic mode that allowed this whole situation to happen in the first place. For her part, Rockwood thinks the voters will be ready to speak this spring, which is when Patch comes up for re-election.

"I think a lot of people haven't been paying attention," Rockwood said. "They just figure it will all fix itself somehow, and it doesn't work that way. We're paying attention now."

For their sake, let's hope it stays that way.

*Chris Collins is the program director of the WHMP radio network, and is managing editor of WHAI FM in Greenfield. He hosts and produces the GCTV public affairs program "Political Potpourri," is a former staff*

# Exhibit L

<u>Public Safety position</u> - Any position in the Fire Department, or Police Department, or any ambulance attendant, Emergency Medical Technician, or other similar position.

<u>Regular Daily Rate</u> - Regular Daily Rate shall be defined as one fifth of the employee's average weekly pay amount.

<u>Regular Employee</u> - A regular employee is one who has completed his/her probationary period and is retained in a position where more than six months continuous employment is intended.

<u>Temporary Employee</u> - An employee in a full or part-time position, which does not require year-round services. Seasonal employees and employees hired for a specific project on a short-term basis are considered temporary employees.

<u>Work Week</u> - The normal workweek for Town employees is from Monday through Friday.

## SECTION 6: EMPLOYMENT PRACTICES

A. <u>Equal Employment Opportunity</u> - The provisions of this policy shall be applied to all employees without discrimination as to age, sex, marital status, race, color, creed, national origin, handicap, veteran status or political affiliation.

Derogatory comments and objectionable conduct of a racist, ethnic, or sexist nature or those aimed at a person's handicap are not only abusive and offensive, but are also violations of the laws, policies and guidelines of equal opportunity. No employee, either male or female, is to be subjected to unsolicited and unwelcome conduct of a sexual nature, nor is any employee to be subjected to comments which are disparaging to his or her handicap, sex, racial or ethnic background.

B. <u>Sexual Harassment Policy</u> - Sexual harassment by any employee of the Town of Bernardston, in any form, shall not be tolerated. Any person who feels he/she has been sexually harassed may report the incident to the Board

9

observing an unacceptable action, should warn the employee. An oral reprimand shall be noted in the employee's personnel file.

Written reprimand: If an oral warning fails to correct conduct warranting disciplinary action, the Supervisor shall issue a written warning. This shall include the reason(s) for the warning and an offer of assistance. A copy of the written warning signed by the Supervisor and the employee shall be placed in the employee's personnel file. The employee may include a written response to the reprimand in their file.

Suspension: An employee may be suspended with cause without pay for a period or periods not to exceed twenty working days in any twelve-month period. Suspension may be in lieu of oral reprimand, written reprimand and disciplinary probation and may be effective immediately. Within forty-eight working hours of the effective date of the suspension the employee shall be provided with a written notice stating the reasons for and the length of suspension.

L. Termination - Employment with the Town has no specified term or length. Employees are free to resign at any time, and the Town reserves the right to terminate employment for any reason permissible by law.

  a) Voluntary Termination - If one should resign from the Town, the Town would appreciate as much advance notice as possible so that arrangements can be made for a replacement. Usually, two weeks written notice is sufficient, except if the employee is in a supervisory capacity, in which case the Town would appreciate a one-month written notice. If one resigns, he/she will be paid for accrued but unused vacation time. One will not be paid for any unused accrued sick or personal leave.

  b) Involuntary Termination - An employee may be terminated due to lack of funds, abolition of a position, an unsuccessful probationary period or through the disciplinary procedure outlined in this policy. An employee who is not giving a probationary period may be discharged for cause. The Supervisor shall provide the employee with a written notice stating the reason(s) for the discharge and the effective date of discharge. If an employee is involuntarily terminated, he/she may

15

appeal the decision following the grievance procedure. Probationary employees who are terminated may not use the grievance procedure. Involuntarily terminated employees will be paid through the date, of termination. He/she will receive pay for any accrued but unused vacation time but will not be paid for any unused accrued sick leave or personal leave.

## SECTION 7: PERSONNEL RECORDS

Personnel records of all Town employees shall be kept by the Department Head in a secure area. Department Head personal records shall be kept in the Selectboards Office. The file for each employee shall contain the following:

   a) Employee application and resume

   b) A copy of any reference checks

   c) "A report of all actions reflecting the original appointment or
      promotion, demotion, reassignment, transfer, separation or
      layoff. Actions relevant to the employee's rate of payor
      position title, commendations, records of disciplinary action,
      training records, performance evaluations and other records
      that may be pertinent to the employee's employment record.

Each Department Head shall submit to the Town Accountant, with the weekly pay warrant, a time sheet for each employee. This time sheet shall specify the number of hours worked and any leave taken, as well as any pertinent information for the personnel records, as legally required. Each Department Head shall be responsible for maintaining a permanent record of the time worked for each employee.
Personnel records shall be considered confidential and access to records shall, unless circumstances dictate

# Exhibit M

# The Commonwealth of Massachusetts

To _Mete H. Kingsley_

_Town of Bernardston_

: We, the Selectmen of _Bernardston_ by virtue of the authority vested in us by the laws of the Commonwealth, do hereby appoint you _Highway Superintendent for one year_ _term to expire on March 31, 2004_

Given at _Bernardston_ this _19th_ day of _March_ 20 _03_.

_Kathleen H. Marks_
_M. Kellas_

Selectmen of _Bernardston_

Recorded _____ A.D. 20 ____

Attest: _____
Town Clerk

Form 452  Hobbs & Warren - Boston

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

FRANKLIN, ss.                                           SUPERIOR COURT
                                                        GREENFIELD DIVISION
                                                        Civ. No. 04-

| | |
|---|---|
| THERESA CAHILL and MERLE KINGSLEY,<br>Plaintiff,<br><br>v.<br><br>MICHAEL SNOW, JOHN PATCH, and PETER BRULOTTE,[1]<br>Defendants | EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO Mass.R.Civ.P. 65 |

The plaintiffs in the above-entitled action, Theresa Cahill and Merle Kingsley, respectfully move that this Court grant a Temporary Restraining Order prohibiting the defendants, Michael Snow, John Patch, and Peter Brulotte, from serving as judges or decision-makers at their hearing that is currently scheduled for January 28, 2004 at 5:00pm.

As grounds for this motion, the plaintiffs state that the defendants are biased against them and have conflicts of interest that prevent them from serving as impartial decision-makers in any hearing of charges against the plaintiffs. The defendants have made numerous statements indicating that they plan to terminate Cahill from her position as Administrative Assistant for the Town of Bernardston, and that they plan to terminate Kingsley from his position as Highway Superintendent. Therefore, if the defendants are permitted to sit as judges at her hearing, the plaintiffs will suffer immediate and irreparable injury, including but not limited to injury to their reputations and the deprivation of their constitutional due process rights.

---

[1] In their capacities as members of the Bernardston Board of Selectmen.