I. Probationary Period - The first three months of employment for all new non-temporary employees of the Town shall be considered a Probationary Period. Employees who leave the service of the Town at the end of this three-month period shall not be entitled to any accrued vacation. Pay for holidays and sick leave will be made retroactively at the end of the probationary period. An employee is entitled

to insurance coverage as established by M.G.L. Chapter 32B. Upon expiration of the probationary period the appointing authority shall notify the probationary employee that:

1. The employee's performance meets satisfactory standards and that the individual will be retained in the position; or

2. The employee's performance, requires additional observation and that the probationary period will be extended an additional period of time not to exceed six months; or

3. The employee's performance, attitude, or conduct was unsatisfactory, stating the reasons, and that removal will occur.

J. <u>Standards of Conduct</u> - Town employees shall avoid any action which might create the impression of using public office for private gain, giving preferential treatment to any person, or conducting themselves in a manner that discredits the town, public officials or fellow employees.

K. <u>Disciplinary Policy</u> - The following are examples of cause for disciplinary action if regulations necessary for proper operation of town departments are not followed:

1) Incompetence or inefficiency in performing assigned duties.
2) Inability to perform one or more critical elements of the position.
3) Refusal to perform a reasonable amount of work or violation of any reasonable official order or failure to carry out any lawful and reasonable directions made by a supervisor.
4) Habitual tardiness or absence from duty.
5) Falsification of time sheets.
6) Use or possession of illegal narcotics or alcohol while on duty.
7) Misuse or unauthorized use of town property.
8) Fraud in securing appointment.
9) Disclosure of confidential information.
10) Abuse of sick leave or absence without leave.

13

11) Conviction of a felony.
12) Violation of safety rules, practices and policies.
13) Engaging in sexual harassment.
14) Any situation or instance of seriousness that disciplinary
    action is warranted.

Disciplinary action may include oral or written reprimands, probation, suspensions and/or discharge.

Oral reprimand: A department head or the Selectmen, upon

observing an unacceptable action, should warn the employee. An oral reprimand shall be noted in the employee's personnel file.

Written reprimand: If an oral warning fails to correct conduct warranting disciplinary action, the Supervisor shall issue a written warning. This shall include the reason(s) for the warning and an offer of assistance. A copy of the written warning signed by the Supervisor and the employee shall be placed in the employee's personnel file. The employee may include a written response to the reprimand in their file.

Suspension: An employee may be suspended with cause without pay for a period or periods not to exceed twenty working days in any twelve-month period. Suspension may be in lieu of oral reprimand, written reprimand and disciplinary probation and may be effective immediately. Within forty-eight working hours of the effective date of the suspension the employee shall be provided with a written notice stating the reasons for and the length of suspension.

L. Termination - Employment with the Town has no specified term or length. Employees are free to resign at any time, and the Town reserves the right to terminate employment for any reason permissible by law.

   a) Voluntary Termination - If one should resign from the Town, the Town would appreciate as much advance notice as possible so that arrangements can be made for a replacement. Usually, two weeks written notice is sufficient, except if the employee is in a supervisory capacity, in which case the Town would appreciate a one-month written notice. If one resigns, he/she will be paid for accrued but unused vacation time. One will not be paid for any unused accrued sick or personal leave.

   b) Involuntary Termination - An employee may be terminated due to lack of funds, abolition of a position, an unsuccessful probationary period or through the disciplinary procedure outlined in this policy. An employee who is not giving a probationary period may be discharged for cause. The Supervisor shall provide the employee with a written notice stating the reason(s) for the discharge and the effective date of discharge. If an employee is involuntarily terminated, he/she may

appeal the decision following the grievance procedure. Probationary employees who are terminated may not use the grievance procedure. Involuntarily terminated employees will be paid through the date, of termination. He/she will receive pay for any accrued but unused vacation time but will not be paid for any unused accrued sick leave or personal leave.

## SECTION 7: PERSONNEL RECORDS

Personnel records of all Town employees shall be kept by the Department Head in a secure area. Department Head personal records shall be kept in the Selectboards Office. The file for each employee shall contain the following:

a) Employee application and resume

b) A copy of any reference checks

c) "A report of all actions reflecting the original appointment or
   promotion, demotion, reassignment, transfer, separation or
   layoff. Actions relevant to the employee's rate of payor
   position title, commendations, records of disciplinary action,
   training records, performance evaluations and other records
   that may be pertinent to the employee's employment record.

Each Department Head shall submit to the Town Accountant, with the weekly pay warrant, a time sheet for each employee. This time sheet shall specify the number of hours worked and any leave taken, as well as any pertinent information for the personnel records, as legally required. Each Department Head shall be responsible for maintaining a permanent record of the time worked for each employee.
Personnel records shall be considered confidential and access to records shall, unless circumstances dictate

observing an unacceptable action, should warn the employee. An oral reprimand shall be noted in the employee's personnel file.

Written reprimand: If an oral warning fails to correct conduct warranting disciplinary action, the Supervisor shall issue a written warning. This shall include the reason(s) for the warning and an offer of assistance. A copy of the written warning signed by the Supervisor and the employee shall be placed in the employee's personnel file. The employee may include a written response to the reprimand in their file.

Suspension: An employee may be suspended with cause without pay for a period or periods not to exceed twenty working days in any twelve-month period. Suspension may be in lieu of oral reprimand, written reprimand and disciplinary probation and may be effective immediately. Within forty-eight working hours of the effective date of the suspension the employee shall be provided with a written notice stating the reasons for and the length of suspension.

L. Termination - Employment with the Town has no specified term or length. Employees are free to resign at any time, and the Town reserves the right to terminate employment for any reason permissible by law.

   a) Voluntary Termination - If one should resign from the Town, the Town would appreciate as much advance notice as possible so that arrangements can be made for a replacement. Usually, two weeks written notice is sufficient, except if the employee is in a supervisory capacity, in which case the Town would appreciate a one-month written notice. If one resigns, he/she will be paid for accrued but unused vacation time. One will not be paid for any unused accrued sick or personal leave.

   b) Involuntary Termination - An employee may be terminated due to lack of funds, abolition of a position, an unsuccessful probationary period or through the disciplinary procedure outlined in this policy. An employee who is not giving a probationary period may be discharged for cause. The Supervisor shall provide the employee with a written notice stating the reason(s) for the discharge and the effective date of discharge. If an employee is involuntarily terminated, he/she may

15

appeal the decision following the grievance procedure. Probationary employees who are terminated may not use the grievance procedure. Involuntarily terminated employees will be paid through the date, of termination. He/she will receive pay for any accrued but unused vacation time but will not be paid for any unused accrued sick leave or personal leave.

## SECTION 7: PERSONNEL RECORDS

Personnel records of all Town employees shall be kept by the Department Head in a secure area. Department Head personal records shall be kept in the Selectboards Office. The file for each employee shall contain the following:

a) Employee application and resume

b) A copy of any reference checks

c) "A report of all actions reflecting the original appointment or
    promotion, demotion, reassignment, transfer, separation or
    layoff. Actions relevant to the employee's rate of pay or
    position title, commendations, records of disciplinary action,
    training records, performance evaluations and other records
    that may be pertinent to the employee's employment record.

Each Department Head shall submit to the Town Accountant, with the weekly pay warrant, a time sheet for each employee. This time sheet shall specify the number of hours worked and any leave taken, as well as any pertinent information for the personnel records, as legally required. Each Department Head shall be responsible for maintaining a permanent record of the time worked for each employee.
Personnel records shall be considered confidential and access to records shall, unless circumstances dictate

16

# Exhibit M

# The Commonwealth of Massachusetts

To Merle H Kingsley Town of Bernardston

: We, the Selectmen of Bernardston by virtue of the authority vested in us by the laws of the Commonwealth, do hereby appoint you Highway Superintendent for a one year term to expire on March 31, 2004.

Given at Bernardston this 19th day of March 20 03

William H Slark
M W Orr
Selectmen of Bernardston

Recorded _____ A.D. 20 ___

Attest: _____ Town Clerk

Form 452 HOBBS & WARREN - Boston

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

FRANKLIN, ss.  SUPERIOR COURT
GREENFIELD DIVISION
Civ. No. 04- 003

THERESA CAHILL and MERLE KINGSLEY,
    Plaintiff,

v.

MICHAEL SNOW, JOHN PATCH, and PETER BRULOTTE,[1]
    Defendants

EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO Mass.R.Civ.P. 65

The plaintiffs in the above-entitled action, Theresa Cahill and Merle Kingsley, respectfully move that this Court grant a Temporary Restraining Order prohibiting the defendants, Michael Snow, John Patch, and Peter Brulotte, from serving as judges or decision-makers at their hearing that is currently scheduled for January 28, 2004 at 5:00pm.

As grounds for this motion, the plaintiffs state that the defendants are biased against them and have conflicts of interest that prevent them from serving as impartial decision-makers in any hearing of charges against the plaintiffs. The defendants have made numerous statements indicating that they plan to terminate Cahill from her position as Administrative Assistant for the Town of Bernardston, and that they plan to terminate Kingsley from his position as Highway Superintendent. Therefore, if the defendants are permitted to sit as judges at her hearing, the plaintiffs will suffer immediate and irreparable injury, including but not limited to injury to their reputations and the deprivation of their constitutional due process rights.

---

[1] In their capacities as members of the Bernardston Board of Selectmen.

A TRUE COPY ATTEST

*[signature]*
CLERK

Wherefore, the plaintiffs respectfully move that this Court issue a Temporary Restraining Order prohibiting the hearing from taking place unless and until an impartial hearing officer is agreed upon by the parties. The plaintiffs further move that this Court order that they remain on paid administrative leave until such hearing takes place.

Respectfully submitted,

| THERESA CAHILL, | MERLE KINGSLEY, |
|---|---|
| Plaintiff, | Plaintiff, |
| By her attorneys, | By his attorney, |
| The Law Firm of Edward F. Berlin | *[signature]* |
| By: *[signature]* | Alexander Z. Nappan, BBO # 366900 |
| Edward F. Berlin, BBO # 039900 | 32 Bray Road |
| Cole Thaler, BBO # 654904 | Shelburne Falls, MA 01370 |
| 20 Federal Street, Suite 5 | Telephone (413) 625-1081 |
| Greenfield, MA 01301-3302 | |
| Telephone (413) 774-4800 | |
| Facsimile (413) 772-2558 | |

Dated: January 13, 2004

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

FRANKLIN, ss.                                          SUPERIOR COURT
                                                       GREENFIELD DIVISION
                                                       Civ. No. 04- 003

THERESA CAHILL and MERLE         )
KINGSLEY,                        )
        Plaintiffs,              )    MEMORANDUM IN SUPPORT OF
                                 )    PLAINTIFFS' MOTION FOR
                                 )    TEMPORARY RESTRAINING
v.                               )    ORDER PURSUANT TO
                                 )    Mass.R.Civ.P. 65
MICHAEL SNOW, JOHN PATCH, and    )
PETER BRULOTTE,[1]               )
        Defendants               )

## I. INTRODUCTION

This Motion for a Temporary Restraining Order arises out of the plans of the defendants, members of the Bernardston Board of Selectmen, to sit as judges in an upcoming disciplinary hearing of charges against the plaintiffs, employees of the Town of Bernardston, despite the fact that all defendants are biased against the plaintiffs, have conflicts of interest, and have publicly stated that they have already decided the plaintiffs have violated the law and will be terminated from their positions. If the defendants are permitted to sit as judges at the plaintiffs' hearing, the plaintiffs will suffer immediate and irreparable injury, including but not limited to injury to their reputations and the deprivation of their constitutional due process right to a fair and impartial hearing. Furthermore, the plaintiffs have no adequate remedy at law, and have a substantial likelihood of success on the merits of their case. In contrast, issuance of the Temporary

---

[1] In their capacities as members of the Bernardston Board of Selectmen.

A TRUE COPY ATTEST

*/s/ Doris D. Doyle*
CLERK

Restraining Order poses minimal risk of harm to the defendants, as the plaintiffs only seek to postpone the hearing until an impartial hearing officer is appointed.

For these reasons, the plaintiffs request that this Court issue a Temporary Restraining Order to prohibit the hearing from taking place unless and until an impartial hearing officer is agreed upon by the parties. The plaintiffs further seek a court order that they remain on paid administrative leave until such hearing takes place.

## II.   FACTUAL BACKGROUND

Cahill has worked as an Administrative Assistant for the Town of Bernardston for 17 years. She is well-known in her community, and her work is trusted and highly esteemed. Until December 2003, Cahill had no disciplinary actions taken against her at any point during her employment; in fact, she had an unblemished personnel record. She is a member of the county retirement system. Kingsley has worked as the Highway Superintendent for the Town of Bernardston for the past three years, and has been reappointed to his position each year for a fixed term of one year. His current term expires in March 2004. See Complaint Exhibit N.

In the fall of 2000, the Town of Bernardston was mistakenly included in the collaborative bidding process coordinated by the Franklin Regional Council of Governments ("the COG") for the purchase of winter sand. Although Robert Mitchell ("Mitchell") was the low bidder in that process, Kingsley and the then-Selectmen knew that Mitchell's sand was contaminated and of poor quality. After discussion in the fall of 2000, Kingsley and the then-Selectmen determined that it was in the best interests of the Town of Bernardston to purchase sand from the next-highest bidder, Cersosimo Industries, Inc. Bernardston officials were familiar with the high

quality of Cersosimo sand. Furthermore, Cersosimo sand cost only five cents more per ton, costing Bernardston a total of $125.00 more than Mitchell's sand.

In March 2001, Mitchell filed a bid protest with the Massachusetts Inspector General's Office. After that office completed its investigation, the Town of Bernardston settled with Mitchell by paying his legal fees. The then-Selectmen were satisfied that the matter of the 2000 sand bid was resolved.

In May 2003, almost two years later, defendant John Patch opened files on Cahill's computer (which was not part of his job duties) and found two documents that he forwarded to the Inspector General's Office. That office subsequently reopened its investigation into the sand bid of 2000. In an interview with the Inspector General, Cahill stated that the two documents had been created at the direction and insistence of then-Selectman William H. Shores. After completing his investigation, the Inspector General concluded that both Cahill and Kingsley had fabricated documents in connection with the purchase of sand from Cersosimo Industries in 2000.

On December 12, 2003, immediately after the Selectmen were notified of the results of the Inspector General's investigation, Cahill and Kingsley were suspended with pay. Soon thereafter, the defendants Patch and Snow made statements indicating that Kingsley and Cahill had broken the law and would inevitably be terminated. It is common knowledge in Bernardston that the defendants Patch and Brulotte have longstanding prejudice against the plaintiffs, and that the defendant Snow has a brother who is eligible for promotion to Kingsley's job if he is terminated.

The defendants intend to sit as decision-makers at a public hearing on January 28, 2004,

to determine whether cause exists to terminate the plaintiffs, despite their bias against the plaintiffs, and their conflict of interest, and the fact that at least one defendant, Patch, will be called as a witness at the hearing.

In addition to the facts set forth above, the plaintiffs submit and incorporate by reference the statement of facts contained in the Verified Complaint which was filed to commence this action. The plaintiffs also incorporate by reference the Affidavits filed herewith.

### III. ARGUMENT

The standard used to consider a request for a temporary restraining order is the same as that used for a preliminary injunction. Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 640 F.Supp. 1159, 1160 (D.Mass. 1986). "[T]o issue injunctive relief correctly, a judge initially must consider whether the plaintiff has demonstrated that without the relief he would suffer irreparable harm, not capable of remediation by a final judgment in law or equity. [Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 n.11 (1980).] The plaintiff also must show that there is a likelihood that he would prevail on the merits of the case at trial. The judge must then balance these two factors against the showing of irreparable harm which would ensue from the issuance, or the denial, of an injunction and the 'chance of success on the merits' presented by the defendant. Id. at 617. An injunction may issue properly only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweigh[s] the defendant's probable harm and likelihood of prevailing on the merits of the case." Commonwealth v. Mass. CRINC, 392 Mass. 79, 87-8 (1984).

1. **Without the issuance of a Temporary Restraining Order, Cahill and Kingsley will suffer irreparable harm, not capable of remediation by a final judgment in law or equity.**

"In the context of a preliminary injunction, the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity."

-4-

Cheney at 617 n.11. Damage to a party's name and reputation has been deemed to be irreparable injury. See Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 488-9 (1986); Ackermann v. President and Trustees of College of Holy Cross, 16 Mass.L.Rptr. 368 (Mass. Super. Ct. May 27, 2003) (Locke, J.). Local newspapers and other media outlets have closely followed the suspension of Cahill and Kingsley and the surrounding allegations. See Complaint Exhibits K and L. Townspeople in Bernardston and beyond, including the plaintiffs' friends, acquaintances and business associates, are aware of the charges against Cahill and Kingsley and the upcoming public hearing. Whatever the outcome of that hearing, the media will undoubtedly publicize it widely. Any negative outcome reached by the Selectmen – which, given their obvious bias against the plaintiffs, seems inevitable -- will grievously and irreparably damage the reputations of the plaintiffs, who have long been involved in town government and are well-known within their communities. The plaintiffs will also suffer injury to their ability to find future employment.

Furthermore, if the public hearing proceeds with the Selectmen as judges, the plaintiffs will be deprived of their due process right to a fair and impartial hearing (see Section 2, infra). When an alleged deprivation of a constitutional right is involved, typically no further showing of irreparable injury is necessary. Matz v. DuBois, Civil No. 95-1227-E (Suffolk Super. Ct. Mar. 14, 1995) (Lauriat, J.), citing Wright & Miller, 11 Federal Practice & Procedure, § 2948. For these reasons, the plaintiffs will suffer irreparable harm if this Court does not issue a Temporary Restraining Order to prohibit the defendants from sitting as decision-makers at the hearing on January 28, 2004.

2. **It is likely that Cahill and Kingsley would prevail on the merits of their case at trial.**

   a) **If the hearing proceeds without an impartial hearing officer, the defendants will have deprived Cahill of a constitutionally protected liberty interest without due process of law.**

"The Fourteenth Amendment to the Federal Constitution offers protection against defamatory charges that tend to severely damage one's reputation and impose a stigma that would interfere with one's ability to take advantage of future employment opportunities." Wilmarth v. Town of Georgetown, 28 Mass. App. Ct. 697, 700 n.7, rev. denied, 408 Mass. 1103 (1990).[2] However, the Supreme Court has stated that "reputation alone, apart from some more tangible interests such as employment, [is not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." Paul v. Davis, 424 U.S. 693, 701 (1976), quoted in Brennan v. Hendrigan, 888 F.2d 189, 195 (1st Cir.1989).

Courts require plaintiffs to satisfy five elements in order to prove the deprivation of a liberty interest without due process. See Wojcik v. Massachusetts State Lottery Commission, 300 F.3d 92, 103 (2002). First, the defendants must level a "charge against [the employee] that might seriously damage his standing and associations in his community" and place his "good name, reputation, honor, or integrity ... at stake." Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972), quoted in Wojcik at 103. Here, the defendants have alleged that Cahill participated in the violation of the state bidding law, G.L. c. 30B, by drafting two false documents; that she created those documents in an attempt to justify the purchase of sand from Cersosimo Industries; and that she misled the Office of the Inspector General by providing contradictory and inaccurate information to an investigator. These are not mere allegations of incompetence, but rather of fraud and dishonesty. See Stetson v. Board of Selectmen, 369 Mass. 755, 761 (1976) (to

---

[2]Massachusetts courts have found an analogous right in art. 12 of the Massachusetts Declaration of Rights. See Vaccaro v. Vaccaro, 425 Mass. 153, 160-1 & n.12 (1997) (following federal analysis to determine whether a liberty interest has been violated under art. 12).

-6-

"constitute a deprivation of liberty based on serious damage to one's standing in the community, more must be shown than mere allegations of incompetence or inefficiency at a particular job"). The charges against Cahill, which are widely known in Bernardston, damage her standing in her community and throw doubt upon her good name and integrity.

Second, "the employee must dispute the charges made against [her] as false." Wojcik at 103. When interviewed, Cahill truthfully told the Inspector General's Office that former Selectman Shores, her boss at the time, directed her to draft two documents related to the Cersosimo contract.[3] Shores was specific about the exact kinds of documents that he wanted, and issued that instruction after speaking with the Inspector General's Office and with Bernardston Town Counsel. When Cahill approached another one of her bosses, Janice Leh (who was Chair of the Board at the time), Leh instructed Cahill to hide the two documents in a file. In short, former Selectman Shores, not a party to this action, violated G.L. c. 30B by ordering the creation of false documents, and his violation went unchecked due to Leh's instruction.

In Cleveland Board of Education v. Loudermill, 470 U.S. 532, 544 (1985), an employee indicated on his employment application that he had not been previously convicted of a felony. When his employer found out that he was a convicted felon, the employee was fired for lying on the application. The Supreme Court held that the employee's termination "turned not on the objective fact that he was an ex-felon or the inaccuracy of his statement to the contrary, but on the subjective question whether he had lied on his application form." Id. As with the Loudermill plaintiff, Cahill's culpability is a subjective issue, as her role in the events of 2000 and 2001 was ministerial at most.

Third, "the stigmatizing statements or charges must have been intentionally publicized by

---

[3]The Inspector General concluded that certain other statements made by Cahill could simply have been due to her being mistaken. See Complaint Exhibit C.

-7-

the government." Wojcik at 103, quoting Bishop v. Wood, 426 U.S. 341, 348-9 (1976). Here, the defendants have publicly stated that Cahill violated the law, and have openly demonstrated their determination to remove her from her position. For example, at a Selectmen's meeting on December 16, 2003, Patch, the Chair of the Board of Selectmen, stated that Cahill was an employee who had "broken the law" and that the sole purpose of the upcoming hearing was to impose punishment upon her. See Complaint Exhibit F. Furthermore, at recent meetings of the Board of Health, Patch has implied that the Town is seeking a permanent replacement for Cahill. See Complaint Exhibit G. And, in a conversation with members of the Board of Health on December 13, 2003, the defendant Snow stated that the Selectmen "had something on Merle and Theresa" and implied that both plaintiffs would be terminated. See Complaint Exhibit G. Clearly, the stigmatizing charges have been intentionally publicized by the defendants in their capacities as Bernardston Selectmen.

Fourth, "the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment." Wojcik at 103. Here, the charges against Theresa were made in conjunction with her suspension from her Administrative Assistant position. Furthermore, the defendants have implied that Cahill's termination is imminent.

Finally, "the government must have failed to comply with the employee's request for an adequate name-clearing opportunity." Wojcik at 103. On January 7, 2004, Cahill, through her attorney, requested that the Board of Selectmen appoint an independent hearing officer so that she would receive a fair hearing. Without discussing the merits of Cahill's request, the defendants voted unanimously to deny it.

Where, as here, the five Wojcik elements are satisfied, "the Constitution's due process protections require the employer to provide the employee with an opportunity to dispute the defamatory allegations." Wojcik at 103. "The precise form of name-clearing hearing to which

an employee might be entitled under the constitution has been left open." Fontana v. Commissioner of the Metropolitan District Commission, 34 Mass. App. Ct. 63, 70 n.7 (1993). However, courts require name-clearing hearings to possess certain elements in order to be constitutionally adequate. First, courts have recognized that the hearing must provide an adequate forum for the employee to "clear his name of the false charges." Wojcik at 103; Roth at 573 n.12. The hearing must also provide "a full opportunity to refute the charges." Fontana at 70 n.7; Roth at 573. "The right to a hearing does not depend on a demonstration of certain success." Loudermill, 470 U.S. at 544.

At the Selectmen's meeting on January 7, 2004, counsel for the defendants stated that impartial decision-makers are not constitutionally required at the upcoming hearing, as Cahill is entitled only to an opportunity to clear her name. However, Cahill could not possibly have a meaningful opportunity to clear her name, refute the charges against her, and dispel the stigma that the defendants have created where each judge has openly expressed his bias and foregone conclusions. Where due process requires a hearing, "[o]f course, an impartial decision maker is essential." Goldberg v. Kelly, 397 U.S. 254, 271 (1970). In some circumstances, it could be possible for a party to have a meaningful opportunity to clear his name in front of judges who are familiar with, or even involved with, his case. Id. However, there is no chance that the defendants in this case could provide a meaningful and constitutionally adequate forum in which Cahill could refute the charges against her or clear her name. Simply put, the history of vindictiveness, conflicts of interest, and overt expressions of bias directed towards the plaintiffs prevents the defendants from providing what Cahill is constitutionally entitled to: "a full opportunity to refute the charges" against her. Fontana at 70 n.7; see also Roth at 573. For these reasons, Cahill is likely to succeed on the merits of her liberty interest claim.